**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| **ROBERT ELTON TODD** | **CIVIL ACTION NO. 14-736** |
| **VERSUS** | **JUDGE ELIZABETH ERNY FOOTE** |
| **CAMERON INTERNATIONAL CORP.** | **MAGISTRATE JUDGE HORNSBY** |

<u>**MEMORANDUM RULING**</u>

Before the Court is a Motion for Summary Judgment filed by the Defendant, Cameron International Corp. ("Cameron"). [Record Document 39.] The Plaintiff, Robert Elton Todd ("Todd"), alleges that Cameron is liable in tort for injuries he suffered while working as a temporary employee at one of Cameron's machine shops. Record Document 1. In moving for summary judgment, Cameron argues that it is immune to Todd's negligence claim under Louisiana worker's compensation law because Todd was working for Cameron as its borrowed employee at the time of the accident. Cameron also seeks summary judgment on Todd's intentional tort claim. For the reasons stated below, the Court **GRANTS** the Defendant's motion.

**I.     Background**

On November 12, 2012, Collier Investments, LLC ("Collier"), a franchise of the temporary employment agency Manpower, hired Todd and referred him to Cameron. Record Documents 42-2, p. 2; 30-2, p. 8; and 39-11, p. 3. The record does not suggest that Todd ever performed any work for Collier before it referred him to Cameron. Cameron was not obligated to accept Collier's referral of Todd. Record Document 39-4,

p. 3.  Cameron assigned Todd to its after-market facility in Shreveport, which repaired and reconditioned valves and related equipment for the petrochemical industry.  Id. at 2-3. Cameron directly hired almost half of the 40-45 people who worked at its Shreveport facility; the rest were referred to work there by Collier.  Record Document 39-3, p. 7.

Initially, Todd worked at the Shreveport facility as a janitor.  Over time his responsibilities expanded to maintenance, painting, and forklift operations.  Record Document 30-5, p. 3.  Then, in April of 2013, Todd began repairing valve components as an entry-level valve technician, a position that required him to polish valve stems using a lapping machine.  Id.; Record Document 39-10, p. 2.  According to Michael Sauseda ("Sauseda"), Todd's supervisor and a direct Cameron hire, Todd received three days of training on the use of the lapping machine.  Record Document 39-10, p. 2.  According to Todd, he received approximately five minutes of training on the basic use of the machine and therefore never learned the location of the emergency shutoff switch.  Record Document 30-5, p. 3.  Todd's son, Cody Todd, who also worked at the Shreveport facility as a valve technician, stated that he refused to work on the lathing machine that Todd operated because he thought it was dangerous.  Record Document 30-6, p. 3.  Todd, however, apparently never voiced any complaints about any of his assignments at the Shreveport facility while he worked there.  Record Document 39-10, p. 2.

The only contract in the record between Cameron and Collier expired in 2011, so there was no written contract between Collier and Cameron that governed the terms of Todd's work for Cameron.  Record Documents  30-2, p. 8., and 30-3.  Other parts of the record, however, reveal that Sauseda supervised all of Todd's work at the Shreveport

facility.  Record Document 39-10, p. 2.  With respect to Todd's janitorial work, Sauseda instructed him on the areas that needed cleaning, and Todd decided the order and the manner in which to clean those areas.  Record Document 30-5, p. 3.  Todd states that he also received more informal instructions from other Collier hires who worked at Cameron's facility, including Cody Todd.  Id.; Record Document 30-2, p. 10.  Collier did not supervise, direct, or control Todd's work at Cameron.  Record Document 39-11, p. 3.  Collier also did not refer any of its hires to Cameron to supervise other Collier hires working there.  Id.

Cameron supplied all tools and safety gear except for steel-toed boots, which each worker was responsible for acquiring.  Record Document 39-10, p. 2.  Collier did not provide any tools, equipment, or safety gear for Todd.  Record Document 39-11, p. 4.  Todd attended routine meetings where both Cameron and Collier employees were present, including several meetings concerning safety.  Record Document 39-7, p. 3.

Cameron had the right to terminate Todd's services at Cameron's facility at any time and for any reason.  Record Documents 39-4, p. 4, and 39-11, p. 4.  Collier's role with respect to Todd while he worked at the Shreveport facility consisted of receiving time records from Cameron for the work Todd performed for Cameron, transmitting invoices to Cameron for furnishing Todd, and issuing paychecks to Todd.  Id.

On the morning of April 10, 2013, Ronnie Brown ("Brown"), a company safety officer, told both Todds that they needed wear safety gloves while using lathing machines. Record Document 30-6, p. 3.  Cody Todd informed Brown that using safety gloves while operating a lathing machine is dangerous because the gloves can get caught in the machine.  Id.  In response, Brown told both of them that they would be terminated from

working for Cameron if they did not wear the gloves.  Id.  Although Todd wore the gloves, Cody Todd refused, allegedly because his experience and skills afforded him more autonomy in his work than Todd.  Record Document 30-5, p. 3. Later that day, Todd's glove caught in the lathing machine, yanking him out of his chair and around the machine before Cody Todd was able to turn it off.  Id. at 4.  Todd attests that he did not know how potentially dangerous the machine was and that had he known of this danger, he would have requested that Sauseda reassign him within the Shreveport facility or asked Collier to assign him to janitorial work elsewhere.  Id.  Collier paid Todd worker's compensation benefits based on the injuries he suffered at the Shreveport facility on April 10, 2013. Record Document 39-11, p. 5.

## II.    Summary Judgment Standard

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. If the party moving for summary judgment fails to satisfy its initial burden of demonstrating the absence of a genuine issue of material fact, the motion must be denied, regardless of the nonmovant's response.  See Little v. Liquid Air Corp., 37 F.3d 1069, 1075

(5th Cir. 1994).   If the motion is properly made, however, Rule 56(c) requires the nonmovant to go "beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial."  <u>Wallace v. Texas Tech. Univ.</u>, 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).  While the nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence, <u>Little</u>, 37 F.3d at 1075; <u>Wallace</u>, 80 F.3d at 1047, all factual controversies must be resolved in favor of the nonmovant, <u>Cooper Tire & Rubber Co. v. Farese</u>, 423 F.3d 446, 456 (5th Cir. 2005).

**III.   Analysis**

   A.   <u>Cameron as Special Employer</u>

Cameron argues that Louisiana worker's compensation law forecloses Todd's negligence claim.  In Louisiana, an employee entitled to worker's compensation from his employer for a work-related injury or illness may not sue that employer in negligence. La. Stat. Ann. § 23:1032 (2016).  This exclusive-remedy provision extends to the borrowing employment context, that is, when "an employee whose services are, with the employee's consent, lent to another employer who temporarily assumes control over the employee's work." <u>Id.</u> § 23:1031(C); Employee, Black's Law Dictionary (10th ed. 2014).  Specifically, section 23:1031(C) of Louisiana Revised Statutes provides in pertinent part:

> In the case of any employee for whose injury or death payments are due and who is, at the time of the injury, employed by a borrowing employer in this Section referred to as a "special employer", and is under the control and direction of the special employer in the performance of the work, both the special employer and the immediate employer, referred to in this Section as a "general employer", shall be liable jointly and in solido to pay benefits as provided under this Chapter. . . . The special and the general employers

shall be entitled to the exclusive remedy protections provided in R.S. 23:1032.

La. Stat. Ann. § 23:1031(C).  To determine whether section 23:1031 and, by implication, the exclusive-remedy provision of section 23:1032 apply to an employer, courts employ a ten-factor test:

> (1) Who has the right of control over the employee beyond mere suggestion of details or cooperation?
> (2) Whose work is being performed?
> (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
> (4) Did the employee acquiesce in the new work situation?
> (5) Did the original employer terminate his relationship with the employee?
> (6) Who furnished the tools and the place of performance?
> (7) Was the new employment over a considerable length of time?
> (8) Who had the right to discharge the employee?
> (9) Who had the obligation to pay the employee?
> (10) Who selects the employee?

U.S. Fire Ins. Co. v. Miller, 381 F.3d 385, 388 (5th Cir. 2004) (citing Ruiz v. Shell Oil Co., 413 F.2d 310, 312-13 (5th Cir. 1969)).[1] [2]  Although no single factor is dispositive, courts

---

[1] There is a discrepancy among courts about whether there are nine or ten factors for this test.  There is no clear trend in recent decisions.  Compare Hebert v. Richard, 2010-1417 (La. App. 3 Cir. 7/6/11), 72 So. 3d 892, 900 (applying ten factors), with McGlothurn v. Wade, 13-759 (La. App. 5 Cir. 5/21/14), 142 So. 3d 217 (applying nine factors).  The Court cannot find any authority that addresses this discrepancy.  Because more recent decisions in the Fifth Circuit applying Louisiana law have used ten factors, see U.S. Fire Ins. Co. v. Miller, 381 F.3d 385, 388 (5th Cir. 2004), the Court will follow suit.

[2] This test is used interchangeably in the federal and Louisiana worker's compensation contexts.  Nguyen v. Weston, 2009-0571, p. 4 (La. App. 4 Cir. 9/9/09), 20 So. 3d 548, 551 ("Jurisprudence dictates that the test to determine borrowed servant status, which precludes tort liability, is the same under both the LWCA[, Louisiana worker's compensation law,] and the LHWCA[, the federal longshore and harbor worker's compensation act]." (citations omitted)).

have placed special emphasis on the first, fourth, fifth, sixth, and seventh factors.  See Alday v. Patterson Truck Line, Inc., 750 F.2d 375, 376 (5th Cir. 1985); Gaudet v. Exxon Corp., 562 F.2d 351, 356 (5th Cir. 1977); Rogers v. Louisiana Dep't of Corr., 43,000, pp. 8-9 (La. App. 2 Cir. 4/30/08), 982 So. 2d 252, 258.  Cameron bears the burden of proving that it is entitled to the protections of section 23:1032's exclusive-remedy provision.  See, e.g., McGinnis v. Waste Mgmt. of Louisiana, L.L.C., 40,330, p. 5 (La. App. 2 Cir. 10/26/05), 914 So. 2d 612, 615.  Whether Cameron qualifies as a special employer for Todd's injuries under section 23:1031(C) is a question of law.  See, e.g., Mejia v. Boykin Bros., 2010-0118, p. 4 (La. App. 1 Cir. 9/10/10), 52 So. 3d 82, 84.

> 1. *Who Had the Right To Control Todd?*

Many courts consider the first factor, the right to control the employee, as the most important factor for establishing a borrowed employment relationship.  See Rogers, 43,000 at 8-9, 982 So. 2d at 258 ("[T]he jurisprudence of this state has uniformly held that the most important element to be considered is the right of control and supervision over the individual."); see also Ruiz, 413 F.2d at 312 ("The factor of control is perhaps the most universally accepted standard for establishing an employer-employee relationship.").  To establish that it had the right to control Todd, Cameron must show more than mere cooperation, that is, it must show that it had the right to authoritatively direct and control Todd's work, as opposed to the ability to suggest details or other instructions necessary to cooperation as a part of a larger undertaking.  See Ruiz, 413 F.2d at 313 (quoting

Standard Oil Co. v. Anderson, 212 U.S. 215, 221 (1909)).  On the other hand, the ability of the employee to control the detailed manner and method of performing his work does not deprive an employer of the right to control the employee.  See Hotard v. Devon Energy Corp., L.P., No. CIV. A. 07-1476, 2008 WL 2228922, at *1, *3 (W.D. La. May 29, 2008), aff'd sub nom. Hotard v. Devon Energy Prod. Co. L.P., 308 F. App'x 739 (5th Cir. 2009) (holding that an offshore oil mechanic was a borrowed employee even when the details of the mechanic's work were under his own control, where the borrowing employer still "assigned all his duties, including what work to do, when to do it  and where it was to be done").  Further, if the employee is supervised by another employee of the original employer who in turn is supervised by the borrowing employer, then the employee is still under the direction and control of the borrowing employer.  See Mejia, 2010-0118 at 5, 52 So. 3d at 85.

Based on the undisputed facts, Cameron had the right to control Todd while he worked at its Shreveport facility.  There is no evidence that Collier exercised any control over Todd while he worked for Cameron.  That Todd exercised his own judgment and discretion in executing janitorial instructions from Cameron does not show that Cameron did not have the right to control him.  See Hotard, 2008 WL 2228922, at *1, *3.  The fact that Todd received instructions from other Collier hires working at Cameron's facility also does not undermine the conclusion that Cameron had the right to control Todd because those Collier hires were also under the control and direction of Cameron.  See Mejia, 2010-0118, p. 5, 52 So. 3d at 85.  This factor therefore supports a finding that Cameron was a special employer.

2.      *Whose Work Was Todd Performing?*

The second factor asks who directly benefitted from Todd's work.  See U.S. Fire, 381 F.3d at 388-89.  The original employer incidentally or indirectly benefitting from the work of the employee, such as where the original employer receives payments from the borrowing employer based on the employee's work for the borrowing employer, does not show that the employee was performing work for the original employer.  See id.  All of Todd's work at the Shreveport facility directly benefitted Cameron by contributing to their after-market valve-repair business.  Therefore, Todd was performing work for Cameron and this factor supports a finding that Cameron was a special employer.

3.      *Was there an agreement or understanding between Cameron and Collier?*

The third factor asks whether there was an understanding between Collier and Cameron as to the parameters of Todd's work.  The understanding does not need to be written.  See Capps v. N.L. Baroid-NL Indus., Inc., 784 F.2d 615, 617 (5th Cir. 1986).  The only written contract between Cameron and Collier in the record expired before Collier hired Todd.[3]  Nonetheless, the evidence shows that there was an understanding between

---

[3] This written contract (the "contract") is the source of two arguments by Todd that the Court should dispose of now.  First, because they were not in effect while Todd worked for Cameron, the terms of the contract are not, as Todd argues, in themselves probative of the relationship among Todd, Cameron, and Collier.  Thus, Todd's reliance on the contract to describe how these parties *in fact* interacted is misplaced.

Second, the expiration of the contract did not, as Todd asserts, foreclose the ability of Cameron to qualify as a borrowed employer.  Todd argues that when the following provision in the contract expired, Cameron's right to assert that it was a special employer when Todd was injured expired along with it:

[Cameron and Collier] recognize [Cameron] as the statutory employer of the employees of [Collier] while such employees are providing services to [Cameron] under this Agreement.  This provision is included for the sole

them regarding Todd's employment.  Collier not only referred Todd to Cameron, but also more than half of the workforce at the Shreveport facility.  According to Collier, it expected that Cameron would exercise control over all of Collier's hires who worked at the Shreveport facility.  Thus, this factor also supports a finding that Cameron was a special employer.

4.   *Did Todd acquiesce to his work with Cameron?*

This factor examines whether Todd was aware of his work conditions and chose to continue working in them.  Brown v. Union Oil Co. of California, 984 F.2d 674, 678 (5th Cir. 1993).[4]  An inherent component of this question is whether Todd was working as a valve

---

purpose of establishing a statutory relationship under La.Rev.Stat. 23:1031 (C-E) and La.Rev.Stat. 23:1061(A) . . . .
Record Document 30-2, p. 14.  This argument is unpersuasive for two reasons.  One, a statutory employer is a separate employer status under the Louisiana worker's compensation law that addresses the scenario in which there are both contractors and subcontractors working on a single project and is thus irrelevant to Cameron's status as a special employer.  See La. Rev. Stat. § 23:1061.  Two, even if the provision's citation to section 23:1031 (C-E), which addresses special employers, caused the Court to construe it as encompassing a special employer relationship, its expiration would not foreclose Cameron from asserting that it was a special employer because special employment status is not a contractual right, as Todd's argument seems to suggest.

[4] In Capps v. N.L. Baroid-NL Indus., Inc., the Fifth Circuit held that if an employee is hired through a temporary employment agency, that employee acquiesces as a matter of law to whatever work situation in which he ultimately finds himself.  See 784 F.2d 615, 617 (5th Cir. 1986).  It is difficult to square this holding with Fifth Circuit cases decided before and after Capps.  In Gaudet v. Exxon Corp., the Fifth Circuit explained that a purpose of this factor is to ensure that the employee had sufficient time to evaluate the risks of his new responsibilities, stating, "if an employee momentarily leaves the work site of his original employer and begins work temporarily for another employer, it might be unfair to deprive him of common law remedies before he can amply assess the risk in the new location."  562 F.2d 351, 357 (5th Cir. 1977).  And when the Fifth Circuit later decided Brown v. Union Oil Co. of California, it declined to adopt the holding in Capps despite the fact that Brown also involved an employee referred to work through an employment referral agency.  See 984 F.2d 674, 678 (5th

specialist long enough to understand the risks of that position.  See Brown, 984 F.2d at 678; Gaudet, 562 F.2d at 356-57; see also Sanchez v. Harbor Const. Co., 2007-0234, p. 7 (La. App. 4 Cir. 10/3/07), 968 So. 2d 783, 787 (holding that the factor was neutral even though the employee never complained of his work because he was only on the job for one day).  Todd states that had he known of the dangers of using the lapping machine, he would have chosen different work with Cameron or another employer.  But this type of ex-post explanation is unhelpful in the worker's compensation context, where injured employees presumably always believe that the work they did was too dangerous.  In addition, Todd never complained about any of his tasks while at the Shreveport facility.  Still, according to Todd, he only worked on the lapping machine for a few days before his injury, so his experience with the lapping machine was quite limited.  See Sanchez, 2007-0234 at 7, 968 So. 2d at 787.  Consequently, this factor in indeterminate as to whether Cameron was a special employer.

### 5.    Did Collier Terminate Its Relationship with Todd?

The fifth factor does not require Cameron to show that Todd completely severed his relationship with Collier; instead, this factor examines the extent of the relationship between Todd and Collier while Todd worked for Cameron.  See Capps, 784 F.2d at 618.  If the relationship is limited to the original employer tendering paychecks to the employee, then this factor weighs in favor of a finding of a borrowed employment relationship.  See id.; U.S. Fire, 381 F.3d at 390.  Here, the extent of Todd's relationship with Collier was

---

Cir. 1993).  Accordingly, the Court applies the rule espoused in Brown, not Capps.

Collier receiving time records from Cameron for the work Todd performed for Cameron, transmitting invoices to Cameron for furnishing Todd, and issuing paychecks to Todd. This factor therefore supports a finding that Cameron was a special employer.

6.    *Who Furnished the Tools and the Place of Performance?*

This factor examines who furnished Todd's tools and gear and where he performed his work.  See id.  Cameron furnished all of Todd's tools and, with the exception of steel-toed boots, all of his safety equipment.  Collier provided no equipment.  Cameron also owned the facility where Todd worked and was injured.[5]  This factor therefore weighs in favor of finding that Cameron was Todd's special employer.

7.    *Was Todd's Work with Cameron over a Considerable Length of Time?*

"Where the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee; however, the converse is not true."  Capps, 784 F.2d at 618.  Thus, even a single day of employment does not support a finding against borrowed employment status.  See id.  Although there is no clear demarcation for when the term of the employee's work becomes "considerable," courts have held that while one month does not weigh in favor of a finding of a borrowed employment relationship, see Brown, 984 F.2d at 679, seventh months does, see Musa v. Litton-Avondale Indus., Inc., 10-627, p. 10 (La. App. 5 Cir. 3/29/11), 63 So. 3d 243, 249.  Todd worked at Cameron's

---

[5] Although Todd argues in his memorandum opposing summary judgment that Cameron did not own the facility, he cites to no evidence supporting that assertion. Record Document 30-2, pp. 9-10.  Cameron, however, points to the affidavit of Gary Townsend, in which Townsend states that "the after-market facility . . . is owned and operated by Cameron . . . ." Record Document 39-4, p. 1.  Without any evidence to contradict Townsend's affidavit, the Court must ignore Todd's unsupported conclusion that Cameron did not own the facility at which he worked.

facility for almost five months.   While the Court declines to label this period as considerable,  it is at the very least indeterminate as to whether there was a borrowed employment relationship between Cameron and Todd. See Brown, 984 F.2d at 679.

        8.      *Who Had the Right To Discharge Todd?*

This factor asks not whether Cameron could terminate his employment with Collier, but whether Cameron could terminate Todd's services for Cameron.  See Capps, 784 F.2d at 618.  Because Cameron could terminate Todd's work at its Shreveport facility at any time and for any reason, this factor supports a finding that Cameron was a special employer.

        9.      *Who Had the Obligation To Pay Todd?*

This factor asks which employer paid for Todd's work. See, e.g., Nguyen v. Weston, 2009-0571, p. 8-9 (La. App. 4 Cir. 9/9/09), 20 So. 3d 548, 553.  However, "[w]hen the borrowing employer pays the lending employer and then the lending employer in turn pays his workers, a finding of borrowed servant is supported." Id. (citing Sanchez, 2007-0234 at 10, 968 So. 2d at 789).  Here, Cameron paid Collier for the time that Todd worked at Cameron's facility and, based on those time reports and payment, Collier paid Todd, so this factor supports a finding that Cameron was a special employer.  See id.

        10.     *Who selected Todd?*

The last factor asks who selected Todd for his work. See U.S. Fire, 381 F.3d at 391. Although Collier hired Todd and referred him to Cameron, Cameron was under no obligation to accept Collier's referral and could have rejected the referral.  Consequently, this factor is indeterminate as to whether Cameron was a special employer.  See id.

With seven of the ten factors supporting a finding that Cameron is a special employer and the remaining three factors neutral, the Court finds that Cameron was Todd's special employer under section 23:1031 at the time of Todd's injury.  In sum, Todd's relationship with Collier and Cameron epitomized borrowed employment: Collier hired Todd for the sole purpose of referring his services to another business—here, Cameron—and once referred to Cameron, Todd performed those services under Cameron's control and for its benefit.  Consequently, Cameron is immune from any claim of negligence stemming from that injury.  See U.S. Fire, 381 F.3d at 388; La. Stat. Ann. § 23:1031.  The  Court therefore **GRANTS** Cameron's motion for summary judgment on Todd's negligence claim.

     B.     Todd's Injury as Intentional Tort

Cameron next argues that it is entitled to summary judgment on Todd's intentional tort claim.  An intentional tort claim is not subject to the exclusive-remedy provision of Louisiana's worker's compensation law.  See La. Stat. Ann. § 23:1032(B);  White v. Monsanto Co., 585 So. 2d 1205, 1208 (La. 1991).  An act is intentional when the employer either (1) consciously desires the physical result of his act; or (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result.  Id. at 1208.

Louisiana courts have narrowly interpreted the intentional tort exception to section 23:1032's exclusive-remedy provision.  "The substantially certain test is satisfied when an employer *consciously* subjects an employee to a hazardous or defective work environment where injury to the employee is *nearly inevitable*."  Guillory v. Domtar Indus., Inc., 95 F.3d

1320, 1327 (5th Cir. 1996). "Believing that someone may, or even probably will, eventually get hurt if a workplace practice is continued does not rise to the level of an intentional act, but instead falls within the range of negligent acts that are covered by workers' compensation." Reeves v. Structural Pres. Sys., 98-1795, p. 9 (La. 3/12/99), 731 So. 2d 208, 212.   Even if an employer is grossly negligent in maintaining the safety of the workplace, he has not committed an intentional tort. Simoneaux v. Excel Grp., LLC, 2006-1050, p. 3 (La. 9/1/06), 936 So. 2d 1246, 1248.

Todd argues his injury was nearly inevitable because Cameron instructed him to work on the complicated lapping machine with gloves despite (1) only training him on its use for five minutes, (2) Cody Todd's refusal to use that machine because it was dangerous, and (3) Cody Todd's warning that wearing gloves while using a lathing machine is dangerous.   Even taking all of the facts that Todd has alleged as true, there is no evidence that his injury on the lapping machine was nearly inevitable. See Guillory, 95 F.3d at 1327.  If true, the allegation that Todd received only five minutes of training on the lapping machine may show negligence on the part of Sauseda and Cameron, but it does not show that it would inevitably lead to an injury. See id.  Likewise, while it might be negligence, declining to act upon Cody Todd's warnings in of itself does not lead to any inference that Cameron was subjecting Todd to a work condition in which his injury was nearly inevitable. See id.  Other than Cody Todd's opinion on the danger of using safety gloves, Todd provides no evidence to show that using safety gloves would mean that his injury would be nearly inevitable. See id.  Consequently, even when the Court resolves all disputes of material fact in favor of Todd, he still is not entitled to an intentional tort

claim against Cameron.  The Court therefore **GRANTS** Cameron's motion for summary judgment on Todd's intentional tort claims.

**IV.     Conclusion**

For the reasons assigned above:

**IT IS ORDERED** that Cameron's motion for summary judgment, Record Document 39, is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that all claims by the Todd against Cameron are **DISMISSED WITH PREJUDICE**; and

A judgment consistent with this memorandum ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 7th day of July, 2016.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE